13407

NEAL, ADMX., v. SOUTHERN RAILWAY CO., CAROLINA DIVISION

(160 S. E., 837)

*Messrs. N. B. Barnwell, Lionel K. Legge* and *Frank G. Tompkins,* for appellant,

*Messrs. W. A. McIlwaine, W. Turner Logan* and *Logan & Grace,* for respondent,

December 31, 1930.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

The plaintiff, Minnie L. Neal, as administratrix of the estate of Emmett H. Neal, deceased, commenced this action against the defendant, Southern Railway, Carolina Division, in the Court of Common Pleas for Charleston County, August 3, 1928, to recover damages for the death of the said Emmett H. Neal, alleged to have been caused by the defendant while he was in the employment of the defendant

as a flagman and engaged in interstate commerce, which action was brought under the Federal Employers' Liability Act (45 U.S.C.A. §§ 51-59) and for the benefit of the widow and minor children of the said deceased. Issues being joined, the case was tried at the October, 1929, term of said Court, before his Honor, Judge H. F. Rice, and a jury, resulting in a verdict for the plaintiff in the sum of $10,000.00. From the entry of judgment on the verdict the defendant has appealed to this Court.

The allegations of error imputed to the trial Judge are set forth under thirteen exceptions, but, as stated in appellant's brief, the exceptions may be considered under six divisions, and in our consideration of the case we shall in the main follow the outline made by appellant's counsel.

The first question presented is: Was there evidence of negligence on the part of the defendant?

It is admitted by the defendant that on the date in question, March 17, 1928, the plaintiff's intestate, Emmett H. Neal, was an employee of the defendant, as a flagman, and engaged in interstate commerce, and the defendant alleges that on said date the said Emmett H. Neal "received a contusion on his head while engaged in his work on a freight train on which he was employed as a flagman, which resulted in his disability of two or three days, after which he returned to work and worked regularly for over two months * * * "; but the defendant denies that it was guilty of any negligence.

In addition to the general allegations, the plaintiff set forth the following specific allegations of negligence:

"Sixth: That, as plaintiff is informed and believes, the injuries and death of the said Emmett H. Neal were caused by the negligence and carelessness of said defendant, Southern Railway, Carolina Division, its agents and servants, as aforesaid, and in the following particulars to wit:

" '(a) In failing and omitting to furnish said decedent a reasonably safe place to work.

" '(b) In causing and allowing an unsafe and unfit and incompetent engineer to operate the train on which said Emmett H. Neal was employed.

" '(c) In causing and allowing the said Claude B. Heidt, engineer of the train on which the said Emmett H. Neal was employed, to fail to keep a careful and proper lookout and to proceed with his train at a reasonable rate of speed under the circumstances.

" '(d) In causing and allowing said Claude B. Heidt to suddenly and unnecessarily put on his emergency brake.

" '(e) In causing and allowing said train to give a sudden unusual and extraordinary jolt, jar or jerk, throwing said Emmett H. Neal down.

" '(f) In causing and allowing the "y" track of said defendant to be obstructed with box cars.

" '(g) In failing and omitting to keep said track clear of box cars as it was its duty to do.

" '(h) In failing to place any light on said box cars or take any other precautions whatever to give notice of the presence of said box cars being on said track.

" '(i) In failing and omitting to follow its own rules' made for the safety of its employees and its trains.' "

In response to the allegations contained in plaintiff's complaint, testimony was introduced which tended to establish the following state of facts:

The injury to the said deceased occurred at Branchville, S. C., while he was in the caboose of defendant's train on which he was working. The train was from Columbia, S. C., bound for Charleston, S. C., and when it reached the town of Branchville it was ordered by the duly authorized agent of the defendant into the "wye," for the purpose of enabling another train going in the opposite direction to pass, and as it (the train on which the said deceased was working) was going into the "wye" it came upon three box cars which had been left there. On seeing these box cars the engineer applied the emergency brakes, stopped the train

suddenly, about fifty feet short of a collision, and as a result of the sudden stopping of the train, without any notice whatsoever, so far as the record discloses, the deceased was knocked down in the caboose and severely injured. This took place in the nighttime. The "wye" into which the train in question was directed to go was presumed to be clear, and the members of the train crew had no notice that it was not clear. The box cars which had been left there were not lighted, were not protected by guard or in any other way, and they were not seen until the train in question was "right on them," within about fifty feet. These cars were in the curve of the "wye," and for that reason it was more difficult to see them; it being in the nighttime and the cars not being lighted or guarded in any way whatsoever. There were sixty-five or seventy cars in this train, and when the engineer came upon these box cars on the curve of the "wye" and applied the emergency brakes, without warning, it caused the train to stop suddenly. One of the witnesses (a member of the train crew) in the course of his testimony testified in this connection as follows:

"Q. When you put on that emergency brake that increases in violence as it goes down the train? A. Yes, sir, it takes it up one by one.

"Q. The shock of it goes right down the train? A. Yes sir."

It may thus be reasonably and readily concluded that the shock was much greater on the caboose on which the deceased was riding, sixty-five or seventy cars back of the engine, than it was on the engine or the car next to the engine, and could have caused the said deceased to be knocked down and injured in the manner alleged, being given no warning that the emergency brakes would be applied. One of the witnesses who saw Neal, the deceased, at Branchville right after he was injured, testified that he had a knot on his head. Soon after the injury occurred to the plaintiff's intestate, the conductor of the train in question was heard to say to the engi-

neer that he (the engineer) had killed a man; that Neal was knocked down. Neither the engineer nor the conductor testified in the case, and it appears that the defendant offered no testimony on the question of negligence. In our opinion there was ample testimony in support of the allegations of negligence to take the case to the jury on that question. As we view the testimony, it clearly supports the contention that the plaintiff's intestate was not furnished a safe place to work. Box cars, contrary to custom, were left on the curve of the "wye," in the nighttime, without any lights and unguarded, where the train in question, consisting of sixty-five or seventy cars, was directed to go, and without any notice to the crew in charge of the said train of the impending danger. Furthermore, it appears that the engineer went into the "wye" without having his train under proper control, under the existing conditions, so as to avoid the necessity of applying the emergency brakes to stop the train to prevent a collision; the sudden and violent stopping of the train having caused the plaintiff's intestate to be knocked down and injured. It is true, as contended by appellant, that the case is governed by the federal rule; but we think the evidence fully meets the requirement of the federal rule, and that negligence on the part of the defendant was shown which resulted in injury to the plaintiff's intestate as the proximate cause thereof.

The second question raised by the exceptions is: If the defendant was negligent, was the negligence the proximate cause of the death of the plaintiff's intestate?

It is the contention of appellant that even if the defendant was negligent and such negligence resulted in injury to plaintiff's intestate, such injury did not cause his death. In this connection appellant concedes that under the "scintilla rule" it could not be said that there was no testimony on this point, but contends that under the federal rule there is not sufficient evidence to remove the question from the "realm of speculation." We are unable

to agree with this contention. While there was testimony introduced by the defendant to the effect that the injury received by the plaintiff's intestate at Branchville, S. C., March 17, 1928, while working for the defendant, did not cause his death, there was testimony introduced on the part of the plaintiff which strongly supported the contrary view, a part of which testimony we quote herewith. Mrs. M. L. Neal, widow of the said deceased, testified in this connection as follows:

"Q. What is your name? A. Minnie L. Neal.

"Q. Where do you live? A. 2 Raco Street.

"Q. Are you the administratrix of the estate of your husband, Emmett H. Neal? A. Yes, sir. (Letters of administration offered in evidence, Exhibit A.)

"Q. What was your husband's business? A. Flagman on the Southern Railway.

"Q. How long had he been in the railroad business? A. I think about 19 years.

"Q. What salary was he getting on the 17th of March, 1928, what wages was he earning? A. From ninety to ninety-five dollars every two weeks.

"Q. Did he have any family? A. Four children.

"Q. Are these the children here in Court? A. Yes, sir.

"Q. What are the names of the children? A. Thomas, 13 years old; Alice, 10; Emmett, 8; and the oldest girl is 17.

"Q. Did or not after the death of Mr. Neal your oldest girl have to go to work? A. Yes, sir; she is working today.

"Q. Now, Mrs. Neal, on the 17th of March what was Mr. Neal's condition, was he brought home in any different condition than usual? A. Yes, sir; he came in and acted very queer, his head was all swollen.

"Q. How did he look? A. His head looked swollen out and his eye.

"Q. Which side of his head was swollen and which eye? A. The left.

"Q. What were you doing when he came in? A. I was getting up, he came in about seven o'clock.

"Q. Who made the fire that day, if any was made? A. I made the fire. He generally makes the fire himself. He came in and sat down and said the doctor was coming to see him, I would have to help him to bed because he got hurt.

"Q. Just tell what took place there that morning, Mrs. Neal, did you or not help him to get to bed? A. Yes, sir; and by that time the doctor was there.

"Q. Who was the doctor? A. Doctor Frampton.

"Q. Did Mr. Neal call him? A. No, I don't know who called him.

"Q. Is he or not the railroad physician? A. Yes, sir.

"Q. What was done, if anything, for your husband? A. Doctor Frampton gave him some kind of liquid to draw the swelling out, he said.

"Q. How did you use that? A. Kept a wet cloth on his head with the medicine on it all day and the doctor came the next morning and said continue that medicine a while longer, then he stopped and did not give him anything until he got up, then he took him to his office and cut his forehead over his eye and let some blood out and took two or three stitches in it and that is all he did for him.

"Q. What was his condition from the date he came home with these injuries to his head and eye on the 17th of March up until the day of his death, did he improve or get worse all the time? A. He got worse all the time.

"Q. Did or not Doctor Frampton urge him to go back to work? A. Yes, sir; he insisted on him going back to work. I heard talking about some kind of metal, I did not understand what it was, I never could understand what it was, I know they were in a hurry to get him back to work, and they put him back when they should not have done it.

"Q. Did Doctor Bradwell attend your husband? A. Yes, sir; he went to Doctor Bradwell some time in April, Doctor Frampton was not doing him any good.

"Q. Has or not Doctor Bradwell been your family physician and Doctor Frampton is the railroad physician, is that correct? A. Yes, sir.

"Q. Now, then, Mrs. Neal, I want you to tell the jury your husband's condition, did it improve or what? A. It gradually got worse, never got any better and his mind never was the same after he came home with his head hurt.

"Q. Did he or not have the same use of his arms and legs after the accident that he did previous to the accident? A. No, sir; he did not have the use of his arms and legs like he should, no.

"Q. Did he or not seem to be the same man he was before the accident? A. No, sir, not a bit like the same man.

"Q. Now, Mrs. Neal, how old was your husband on the 17th of March, 1928? A. He was 39.

"Q. What was his general health before the time you saw him come home having been injured? A. It was pretty good, he never was sick much, just felt bad once in a while, he was always healthy.

"Q. Was he a stout hearty man? A. A stout heavy man.

"Q. Was he or not in good health up to the time of this accident? A. Good health as far as I know.

"Q. Now, Mrs. Neal, you stated that your husband got ninety to ninety-five dollars every two weeks, did he or not provide for you and the children? A. His money was spent at home, not outside.

"Q. Of that money how much was given for the support of the home, how much was turned over to you? A. All except for his expenses, six or seven dollars.

"Q. The rest he turned over to you for the support of you and your children? A. Yes, sir.

"Q. Now, Mrs. Neal, out of that salary, out of his wages was he or not able to save anything? A. He never saved very much.

"Q. He had to spend it for the support of you and your children? A. Yes, sir.

"Q. Now he was brought home you say on the 17th of March, 1928, how long did Doctor Frampton visit him at your home? A. Four or five days, then he took him to his office.

"Q. What was his condition then, did he get better or worse? A. He got worse.

"Q. Did he continue to get worse or better? A. He got worse all the time.

"Q. What happened to him on the 13th of June, 1928? A. He became unconscious and did not know anything more for about five hours, then he died."

Dr. Bradwell, the family physician, who was called in after plaintiff's intestate had been seen by Dr. Frampton, testified as to the cause of death as follows:

"A. The blow on the head according to my diagnosis caused a small hemorrhage at the time of the accident which he did not suffer with at that time and when the pressure accumulated sufficient for him to feel it and give him pain in the head and eye the hemorrhage was sufficient to cause pressure which gradually increased and he died on the 13th of June.

"Q. Now, Doctor Bradwell, is it or not probable, or possible for an injury of the head to cause cerebral hemorrhage with little or no external evidence following the injury? A. It is repeatedly recorded where such injuries cause hemorrhage with no evidence at all which come on days or weeks after the accident happened, that is, paralysis may develop a long while after the accident with no external evidence at all. A person can go back to work with a hemorrhage of the brain and he would not know it, or the physician examining him would not know it until the symptoms develop."

Further on in the course of his testimony Dr. Bradwell gave this testimony on the question: "A. With the healthy condition of the man previous to his death, or rather his injury with the paralysis immediately following the injury and increasing and with the evidence of hemorrhage in the

brain and the fluid and the conditions of the brain, I believe that the accident was the beginning of the hemorrhage and the hemorrhage was the cause of death, if he had not had the blow he would not have had the hemorrhage."

As stated, the defendant offered testimony on this point in conflict with the testimony to which we have called attention, but the weight of all the testimony was a matter for the jury, and, in our opinion, the trial Judge committed no error in submitting the question to the jury.

Another contention of the appellant is that the plaintiff's intestate assumed the risk, and for that reason the plaintiff cannot recover.

As contended by the appellant, and conceded by the respondent, the plaintiff's intestate assumed all risks ordinarily incident to his employment and also assumed such extraordinary risks as were obvious, or even those not obvious if he had knowledge of them, or by the exercise of reasonable diligence should have known of them. But under our view of the case at bar this well-recognized rule does not prevent recovery by the plaintiff in this case. The facts in the case to which we called attention in our consideration of the first question presented, which need not be restated here, show clearly that it cannot be held as a matter of law that the plaintiff's intestate assumed the risk, but the question was one to be submitted to the jury under proper instruction. In this connection we call attention to the fact that no error is alleged with reference to the Judge's charge to the jury, and we, therefore, assume that his Honor committed no error in instructing the jury.

The fourth question raised by the exceptions is: Was the release signed by the plaintiff's intestate valid and binding?

The defendant introduced in evidence a paper signed by the plaintiff's intestate which purported to release the defendant from all claims, including the damages sought in this action, which paper was admitted in evidence in support of defendant's fourth defense set up in its answer,

which defense was as follows: "Fourth—For a Fourth Defense. That subsequent to the accident mentioned in the complaint and before the commencement of this action, the said Emmett H. Neal, for valuable consideration, released the defendant company from all claims, demands, actions, rights of action, now or hereafter existing, either at law or in equity, including all claims on account of his personal representatives for the pecuniary loss sustained by his relatives entitled thereto by reason of his death and from liability from payment of any further sum or sums of money for and because of or arising out of any injuries he may have received in the accident mentioned and referred to in said complaint; a copy of which release is hereto annexed as a part hereof and marked Exhibit 'A'; and this defendant pleads the same as a bar to this action."

To this defense the plaintiff replied as follows:

"REPLY

"Plaintiff above named replying to the new matter set up as a fourth defense in paragraph fourth of defendant's amended answer, alleges as follows:

"First: That immediately upon being apprised of the amount of the consideration paid for the alleged release set out in defendant's answer, which was not until said defendant's answer was served on her counsel, she immediately tendered back the amount of said release, to wit, the sum of Twenty-six ($26.00) Dollars, which tender was refused.

"Second: That on information and belief said alleged and pretended release was obtained by fraud, misrepresentation, coercion and for a grossly inadequate sum and by wickedly, wrongfully and fraudulently taking advantage of plaintiff; the truth and fact being that the physician and surgeon representing and employed by said defendant company falsely represented to plaintiff's intestate that his injuries were of a very slight and trivial character and within a short time after the signing of said release said plaintiff's intes-

tate died as a result of said injuries, and further that plaintiff's intestate was coerced into signing said release by the threat of said defendant that he could not go to work unless he signed said release and would lose his job and that said release was a mere formality, and for a further reason that the sum of Twenty-six ($26.00) Dollars was a grossly and shockingly inadequate consideration for a release for injuries of such character that they caused the death of plaintiff's intestate and further that said plaintiff's intestate had no independent counsel or advice and was in no position, being a working man and unacquainted and ignorant of matters of this kind, to deal on equal terms with a shrewd, experienced and cold-bloodedly calculating and forceful agents of said defendant who procured said release and that said release is absolutely void."

In support of appellant's position counsel for appellant cite the case of *Chicago & N. W. R. Co. v. Wilcox* (C. C. A.), 116 F., 913, and quotes at length therefrom. Granting that the rule declared in that case is the correct rule governing the issue now involved, it does not follow that the plaintiff is prevented from recovering in the case at bar. We do not consider it necessary to discuss or state the testimony bearing on the release, as to how it was procured, but deem it sufficient to state that, in our opinion, the record in the case discloses testimony which required the trial Judge to submit the issue raised concerning the procurement of the release to the jury. Whether the release was obtained from the plaintiff's intestate in the manner alleged by the plaintiff, to which allegations we have referred, it is not for this Court to say, that is, this Court, under the rule, is not required to pass upon the weight of the testimony; but, in our opinion, the testimony was susceptible of that inference and we think that the trial Judge committed no error in submitting the issue to the jury.

The fifth question raised by the exceptions is: Should a mistrial have been ordered in this case?

The following statement which appears in the trans-

cript of record is sufficient to show the grounds upon which the defendant's motion for a mistrial was based and the ruling of the trial Judge on the motion:

"Upon reconvening on the morning of October 31st, and after the jury had reassembled, and the case was about to proceed, it was brought to the attention of the Court without any request or statement by the foreman that the infant daughter of the foreman of the jury had been asphyxiated the night before and had died. The trial Judge thereupon stated that the foreman could, in these circumstances, be in no fit condition to continue the trial of the case and counsel on both sides concurred in this statement.

"Mr. Barnwell, for the defendant, thereupon moved for a mistrial which was refused by the trial Judge, with the following statement:

"Court: I think we can go on with this case on Monday, unless something happens between now and then which makes it impossible and I will let the jury go until then, so you are excused until ten o'clock on Monday morning."

The ordering of a mistrial must, as a general rule, be left to the sound discretion of the trial Judge, and we deem it sufficient to state that in refusing the motion in this case, his Honor, in our opinion, properly exercised his discretion.

The sixth, and last, question raised by the exceptions is with reference to an alleged error imputed to the trial Judge in the admission of incompetent testimony. The testimony complained of was the testimony of the witnesses J. H. Anderson and M. G. Godwin, when they stated in substance that they heard Conductor Brown, conductor on the train in question, say to the engineer, Heidt, that Neal was knocked down in the cab; that he (Heidt) had killed a man.

The admission of statements on the ground of being part of the *res gestae* is a matter that must be left largely to the discretion of the trial Judge, for the reason that he is in a position to see and hear the witnesses testify and be able

to get a clear understanding of the transaction as it occurred, and unless convinced that the trial Judge abused his discretion or was clearly in error this Court will not interfere. As we view the record in the case at bar, the statements complained of by appellant were made by the conductor very soon after the accident occurred, within a very few minutes, and at the first opportunity he had, after the accident to speak to Heidt, the engineer, with reference to the sudden stopping of the train. Evidenly the words were spoken by the conductor under the active and immediate influence of what transpired at the time and place in question. It is our opinion that the trial Judge committed no error in the admission of this testimony.

The exceptions are overruled, and the judgment affirmed.

MESSRS. JUSTICES BLEASE and STABLER and MR. ACTING JUSTICE C. T. GRAYDON concur.

MR. JUSTICE COTHRAN dissents.